J-S38002-17

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | | |
|---|---|---|
| IN RE: S.R.S., A MINOR | : | IN THE SUPERIOR COURT OF |
| | : | PENNSYLVANIA |
| | : | |
| | : | |
| | : | |
| | : | |
| APPEAL OF: C.A.S., MOTHER | : | No. 2786 EDA 2016 |

Appeal from the Order and Decree July 25, 2016
In the Court of Common Pleas of Philadelphia County
Family Court Juvenile Division at No(s): CP-51-AP-0000018-2016,
CP-51-DP-0001672-2013, FID: 51-FN-003313-2013

| | | |
|---|---|---|
| IN RE: S.N.G., A MINOR | : | IN THE SUPERIOR COURT OF |
| | : | PENNSYLVANIA |
| | : | |
| | : | |
| | : | |
| | : | |
| APPEAL OF: C.A.S., MOTHER | : | No. 2793 EDA 2016 |

Appeal from the Order and Decree July 25, 2016
In the Court of Common Pleas of Philadelphia County
Family Court Juvenile Division at No(s): CP-51-AP-0000017-2016,
CP-51-DP-0001511-2014, FID: 51-FN-003313-2013

BEFORE: GANTMAN, P.J., SHOGAN, J., and FITZGERALD, J.*

MEMORANDUM BY GANTMAN, P.J.: **FILED JUNE 20, 2017**

Appellant, C.A.S. ("Mother"), appeals from the orders and the decrees, entered in the Philadelphia County Court of Common Pleas Family Court Juvenile Division, which changed the family goal to adoption and granted the petitions of the Department of Human Services ("DHS") for involuntary termination of Mother's parental rights to her minor children, S.R.S. and

_____

*Former Justice specially assigned to the Superior Court.

S.N.G. ("Children").[1]  We affirm.

In its opinion, the Juvenile Court correctly set forth the relevant facts and procedural history of this case.  We add only the following: procedurally, DHS filed petitions on January 7, 2016, to change the family goal from reunification to adoption and involuntarily terminate Mother's parental rights to Children.  Mother timely filed notices of appeal and concise statements of errors complained of on appeal per Pa.R.A.P. 1925(a)(2)(i) on August 23, 2016.

Mother raises two issues for our review:

> THE [JUVENILE] COURT ERRED AND/OR ABUSED ITS
> DISCRETION BY ENTERING AN ORDER ON JULY 25, 2016,

_____

[1] The trial court held a goal change and termination hearing for Children on July 25, 2016, changed the family goal from reunification to adoption, and involuntarily terminated Mother's parental rights to Children.  Mother timely filed notices of appeal.  Notwithstanding the initial appeal filing date, the appeal was not listed for disposition due to the delay in transmittal of the certified record to this Court.  The certified record was first due on September 22, 2016.  After initial contact with the trial court, it informed this Court that the trial court had not started the opinion yet.  Following numerous requests for updates, this Court finally received the certified record on February 15, 2017.  As a result, the briefing schedule for this case was delayed by nearly five months.  Further delay occurred when Mother's counsel requested a thirty-day extension, but received only a two-week extension, and then failed to file Mother's appellate brief, which prompted this Court to file an abandonment order on April 3, 2017.  Counsel untimely filed Mother's appellate brief on April 7, 2017; this Court vacated the abandonment order on April 12, 2017.  We offer this procedural history to explain the delay in the resolution of this child-fast-track appeal.  ***See In re T.S.M.***, 620 Pa. 602, 609 n.7, 71 A.3d 251, 255 n.7 (2013) (reproaching this Court for **unexplained** delays in disposition of cases involving at-risk children, causing them to remain in stasis for substantial, unnecessary time).

INVOLUNTARILY TERMINATING THE PARENTAL RIGHTS OF MOTHER…. MORE SPECIFICALLY, THE [JUVENILE] COURT ABUSED ITS DISCRETION AS SUBSTANTIAL, SUFFICIENT AND CREDIBLE EVIDENCE WAS PRESENTED AT THE TIME OF TRIAL WHICH WOULD HAVE SUBSTANTIATED DENYING THE PETITION FOR GOAL CHANGE/TERMINATION. [DHS] HAS FAILED TO MEET ITS BURDEN FOR TERMINATION BY CLEAR AND CONVINCING EVIDENCE UNDER 23 PA.C.S.[A.] SECTIONS 2511(A)(1) AND (2) BECAUSE THE EVIDENCE WAS PRESENTED THAT [MOTHER] HAD SUBSTANTIALLY MET HER [FAMILY SERVICE PLAN] GOALS AND THEREBY REMEDIED HER SITUATION. FURTHERMORE, THE [JUVENILE] COURT ERRED BY FINDING THAT MOTHER DID NOT HAVE THE CAPACITY TO PARENT.

THE [JUVENILE] COURT ERRED AND/OR ABUSED ITS DISCRETION BY TERMINATING THE PARENTAL RIGHTS OF MOTHER AND CHANGING [CHILDREN'S] GOAL TO ADOPTION, PURSUANT TO 23 PA.C.S.A. SECTIONS 2511(B) WHERE DHS FAILED TO PROVE CLEAR AND CONVINCING EVIDENCE THAT INVOLUNTARY TERMINATING [MOTHER'S] PARENTAL RIGHTS AND GOAL CHANGE TO ADOPTION BEST SERVED THE EMOTIONAL NEEDS AND WELFARE OF…CHILDREN. EVIDENCE WAS PRESENTED THAT…CHILDREN HAD A BOND WITH…MOTHER WHICH WOULD BE HARMFUL TO…[CHILDREN] TO SEVER.

(Mother's Brief at 5).

Appellate review of goal change decisions implicates the following principles:

On appeal, goal change decisions are subject to an abuse of discretion standard of review. *In re N.C.,* 909 A.2d 818, 822 (Pa.Super. 2006).

In order to conclude that the trial court abused its discretion, we must determine that the court's judgment was "manifestly unreasonable," that the court did not apply the law, or that the court's action was "a result of partiality, prejudice, bias or ill will,"

- 3 -

as shown by the record. We are bound by the trial court's findings of fact that have support in the record. The trial court, not the appellate court, is charged with the responsibilities of evaluating credibility of the witnesses and resolving any conflicts in the testimony. In carrying out these responsibilities, the trial court is free to believe all, part, or none of the evidence. When the trial court's findings are supported by competent evidence of record, we will affirm, "even if the record could also support an opposite result."

*Id.* at 822-23 (internal citations omitted).

The Juvenile Act controls the disposition of dependent children. *In re R.P.*, 957 A.2d 1205, 1217 (Pa.Super. 2008). Section 6351 provides in relevant part:

**§ 6351.    Disposition of dependent child**

\* \* \*

**(f)    Matters to be determined at permanency hearing.**—At each permanency hearing, a court shall determine all of the following:

(1) The continuing necessity for and appropriateness of the placement.

(2) The appropriateness, feasibility and extent of compliance with the permanency plan developed for the child.

(3) The extent of progress made toward alleviating the circumstances which necessitated the original placement.

(4) The appropriateness and feasibility of the current placement goal for the child.

(5) The likely date by which the placement goal for the child might be achieved.

(5.1) Whether reasonable efforts were made to finalize the permanency plan in effect.

(6) Whether the child is safe.

\* \* \*

(9) If the child has been in placement for at least 15 of the last 22 months or the court has determined that aggravated circumstances exist and that reasonable efforts to prevent or eliminate the need to remove the child from the child's parent, guardian or custodian or to preserve and reunify the family need not be made or continue to be made, whether the county agency has filed or sought to join a petition to terminate parental rights and to identify, recruit, process and approve a qualified family to adopt the child unless:

(i) the child is being cared for by a relative best suited to the physical, mental and moral welfare of the child;

(ii) the county agency has documented a compelling reason for determining that filing a petition to terminate parental rights would not serve the needs and welfare of the child; or

(iii) the child's family has not been provided with necessary services to achieve the safe return to the child's parent, guardian or custodian within the time frames set forth in the permanency plan.

\* \* \*

**(f.1) Additional determination.**—Based upon the determinations made under subsection (f) and all relevant evidence presented at the hearing, the court shall determine one of the following:

(1) If and when the child will be returned to the child's parent, guardian or custodian in cases where the return of the child is best suited to the safety, protection and physical, mental and moral welfare of the child.

(2) If and when the child will be placed for adoption, and the county agency will file for termination of parental rights in cases where return to the child's parent, guardian or custodian is not best suited to the safety, protection and physical, mental and moral welfare of the child.

(3) If and when the child will be placed with a legal custodian in cases where the return to the child's parent, guardian or custodian or being placed for adoption is not best suited to the safety, protection and physical, mental and moral welfare of the child.

(4) If and when the child will be placed with a fit and willing relative in cases where return to the child's parent, guardian or custodian, being placed for adoption or being placed with a legal custodian is not best suited to the safety, protection and physical, mental and moral welfare of the child.

\* \* \*

**(f.2) Evidence.**—Evidence of conduct by the parent that places the health, safety or welfare of the child at risk, including evidence of the use of alcohol or a controlled substance that places the health, safety or welfare of the child at risk, shall be presented to the court by the county agency or any other party at any disposition or permanency hearing whether or not the conduct was the basis for the determination of dependency.

**(g) Court order.**—On the basis of the determination made under subsection (f.1), the court shall order the continuation, modification or

> termination of placement or other disposition which
> is best suited to the safety, protection and physical,
> mental and moral welfare of the child.

42 Pa.C.S.A. § 6351(f), (f.1), (f.2), (g).

"When the child welfare agency has made reasonable efforts to return a [dependent] child to [the child's] biological parent, but those efforts have failed, then the agency must redirect its efforts towards placing the child in an adoptive home." *In re N.C., supra* at 823 (citing *In re G.P.-R.*, 851 A.2d 967, 973 (Pa.Super. 2004)).

> Although the agency has the burden to show a goal change
> would serve the child's best interests, "[s]afety,
> permanency, and well-being of the child must take
> precedence over **all** other considerations" under Section
> 6351. *In re D.P.*, 972 A.2d 1221, 1227 (Pa.Super. 2009),
> *appeal denied*, 601 Pa. 702, 973 A.2d 1007 (2009)
> (emphasis in original); *In re S.B.*, 943 A.2d 973, 978
> (Pa.Super. 2008), *appeal denied*, 598 Pa. 782, 959 A.2d
> 320 (2008). "[T]he parent's rights are secondary" in a
> goal change proceeding. *In re D.P., supra*.
>
> Because the focus is on the child's best interests, a goal
> change to adoption might be appropriate, even when a
> parent substantially complies with a reunification plan. *In
> re N.C., supra* at 826-27. Where a parent's "skills,
> including her judgment with regard to the emotional well-
> being of her children, remain problematic[,]" a goal change
> to adoption might be appropriate, regardless of the
> parent's compliance with a permanency plan. *Id.* at 825.
> The agency is not required to offer services indefinitely,
> where a parent is unable to properly apply the instruction
> provided. *In re A.L.D.*, 797 A.2d 326, 340 (Pa.Super.
> 2002). *See also In re S.B., supra* at 981 (giving priority
> to child's safety and stability, despite parent's substantial
> compliance with permanency plan); *In re A.P.*, 728 A.2d
> 375, 379 (Pa.Super. 1999), *appeal denied*, 560 Pa. 693,
> 743 A.2d 912 (1999) (holding where, despite willingness,
> parent cannot meet "irreducible minimum parental

responsibilities, the needs of the child must prevail over the rights of the parent"). Thus, even where the parent makes earnest efforts, the "court cannot and will not subordinate indefinitely a child's need for permanence and stability to a parent's claims of progress and hope for the future." *In re Adoption of R.J.S.*, 901 A.2d 502, 513 (Pa.Super. 2006).

*In re R.M.G.*, 997 A.2d 339, 347 (Pa.Super. 2010), *appeal denied*, 608 Pa. 648, 12 A.3d 372 (2010) (some internal citations and quotation marks omitted).

Appellate review of termination of parental rights cases implicates the following principles:

> In cases involving termination of parental rights: "our standard of review is limited to determining whether the order of the trial court is supported by competent evidence, and whether the trial court gave adequate consideration to the effect of such a decree on the welfare of the child."

*In re Z.P.*, 994 A.2d 1108, 1115 (Pa.Super. 2010) (quoting *In re I.J.*, 972 A.2d 5, 8 (Pa.Super. 2009)).

> Absent an abuse of discretion, an error of law, or insufficient evidentiary support for the trial court's decision, the decree must stand. … We must employ a broad, comprehensive review of the record in order to determine whether the trial court's decision is supported by competent evidence.
>
> *In re B.L.W.*, 843 A.2d 380, 383 (Pa.Super. 2004) (*en banc*), *appeal denied*, 581 Pa. 668, 863 A.2d 1141 (2004) (internal citations omitted).
>
> Furthermore, we note that the trial court, as the finder of fact, is the sole determiner of the credibility of witnesses and all conflicts in testimony are to be resolved by the finder of fact. The burden of proof is

on the party seeking termination to establish by clear and convincing evidence the existence of grounds for doing so.

*In re Adoption of A.C.H.*, 803 A.2d 224, 228 (Pa.Super. 2002) (internal citations and quotation marks omitted). The standard of clear and convincing evidence means testimony that is so clear, direct, weighty, and convincing as to enable the trier of fact to come to a clear conviction, without hesitation, of the truth of the precise facts in issue. *In re J.D.W.M.*, 810 A.2d 688, 690 (Pa.Super. 2002). We may uphold a termination decision if any proper basis exists for the result reached. *In re C.S.*, 761 A.2d 1197, 1201 (Pa.Super. 2000) (*en banc*). If the court's findings are supported by competent evidence, we must affirm the court's decision, even if the record could support an opposite result. *In re R.L.T.M.*, 860 A.2d 190, 191-92 (Pa.Super. 2004).

*In re Z.P., supra* at 1115-16 (quoting *In re Adoption of K.J.*, 936 A.2d 1128, 1131-32 (Pa.Super. 2007), *appeal denied*, 597 Pa. 718, 951 A.2d 1165 (2008)).

DHS filed a petition for the involuntary termination of Mother's parental rights to Children on the following grounds:

**§ 2511.  Grounds for involuntary termination**

**(a)  General Rule.**—The rights of a parent in regard to a child may be terminated after a petition filed on any of the following grounds:

(1) The parent by conduct continuing for a period of at least six months immediately preceding the filing of the petition either has evidenced a settled purpose of relinquishing parental claim to a child or has refused or failed to perform parental duties.

(2) The repeated and continued incapacity, abuse, neglect or refusal of the parent has caused the child to be without essential parental care, control or

subsistence necessary for his physical or mental well-being and the conditions and causes of the incapacity, abuse, neglect or refusal cannot or will not be remedied by the parent.

\* \* \*

(5) The child has been removed from the care of the parent by the court or under a voluntary agreement with an agency for a period of at least six months, the conditions which led to the removal or placement of the child continue to exist, the parent cannot or will not remedy those conditions within a reasonable period of time, the services or assistance reasonably available to the parent are not likely to remedy the conditions which led to the removal or placement of the child within a reasonable period of time and termination of the parental rights would best serve the needs and welfare of the child.

\* \* \*

(8) The child has been removed from the care of the parent by the court or under a voluntary agreement with an agency, 12 months or more have elapsed from the date of removal or placement, the conditions which led to the removal or placement of the child continue to exist and termination of parental rights would best serve the needs and welfare of the child.

\* \* \*

**(b) Other considerations.**—The court in terminating the rights of a parent shall give primary consideration to the developmental, physical and emotional needs and welfare of the child. The rights of a parent shall not be terminated solely on the basis of environmental factors such as inadequate housing, furnishings, income, clothing and medical care if found to be beyond the control of the parent. With respect to any petition filed pursuant to subsection (a)(1), (6) or (8), the court shall not consider any efforts by the parent to remedy the conditions described therein which are first initiated subsequent to

the giving of notice of the filing of the petition.

23 Pa.C.S.A. § 2511(a)(1), (a)(2), (a)(5), (a)(8), and (b). "Parental rights may be involuntarily terminated where any one subsection of Section 2511(a) is satisfied, along with consideration of the subsection 2511(b) provisions." *In re Z.P., supra* at 1117.

> Initially, the focus is on the conduct of the parent. The party seeking termination must prove by clear and convincing evidence that the parent's conduct satisfies the statutory grounds for termination delineated in Section 2511(a). Only if the court determines that the parent's conduct warrants termination of…her parental rights does the court engage in the second part of the analysis pursuant to Section 2511(b): determination of the needs and welfare of the child under the standard of best interests of the child.

*In re L.M.*, 923 A.2d 505, 511 (Pa.Super. 2007) (internal citations omitted).

> Termination under Section 2511(a)(1) involves the following:

> > To satisfy the requirements of [S]ection 2511(a)(1), the moving party must produce clear and convincing evidence of conduct, sustained for at least the six months prior to the filing of the termination petition, which reveals a settled intent to relinquish parental claim to a child or a refusal or failure to perform parental duties. In addition,

> > > Section 2511 does not require that the parent demonstrate both a settled purpose of relinquishing parental claim to a child and refusal or failure to perform parental duties. Accordingly, parental rights may be terminated pursuant to Section 2511(a)(1) if the parent either demonstrates a settled purpose of relinquishing parental claim to a child or fails to perform parental duties.

> > Once the evidence establishes a failure to perform parental duties or a settled purpose of relinquishing parental rights, the court must engage in three lines of inquiry: (1) the

- 11 -

parent's explanation for…her conduct; (2) the post-abandonment contact between parent and child; and (3) consideration of the effect of termination of parental rights on the child pursuant to Section 2511(b).

*In re Z.S.W.*, 946 A.2d 726, 730 (Pa.Super. 2008) (internal citations omitted). Regarding the six-month period prior to filing the termination petition:

> [T]he trial court must consider the whole history of a given case and not mechanically apply the six-month statutory provision. The court must examine the individual circumstances of each case and consider all explanations offered by the parent facing termination of…her parental rights, to determine if the evidence, in light of the totality of the circumstances, clearly warrants the involuntary termination.

*In re B.,N.M.*, 856 A.2d 847, 855 (Pa.Super. 2004), *appeal denied*, 582 Pa. 718, 872 A.2d 1200 (2005) (internal citations omitted).

The grounds for termination of parental rights under Section 2511(a)(2), due to parental incapacity that cannot be remedied, are not limited to affirmative misconduct; to the contrary those grounds may include acts of refusal as well as incapacity to perform parental duties. *In re A.L.D., supra* at 337. "Parents are required to make diligent efforts towards the reasonably prompt assumption of full parental responsibilities." *Id.* at 340. The fundamental test in termination of parental rights under Section 2511(a)(2) was long ago stated in the case of *In re Geiger*, 459 Pa. 636, 331 A.2d 172 (1975), where the Pennsylvania Supreme Court announced that under what is now Section 2511(a)(2), "the petitioner for

involuntary termination must prove (1) repeated and continued incapacity, abuse, neglect or refusal; (2) that such incapacity, abuse, neglect or refusal caused the child to be without essential parental care, control or subsistence; and (3) that the causes of the incapacity, abuse, neglect or refusal cannot or will not be remedied." *In Interest of Lilley*, 719 A.2d 327, 330 (Pa.Super. 1998).

"Termination of parental rights under Section 2511(a)(5) requires that: (1) the child has been removed from parental care for at least six months; (2) the conditions which led to removal and placement of the child continue to exist; and (3) termination of parental rights would best serve the needs and welfare of the child." *In re Z.P., supra* at 1118.

"[T]o terminate parental rights under Section 2511(a)(8), the following factors must be demonstrated: (1) [t]he child has been removed from parental care for 12 months or more from the date of removal; (2) the conditions which led to the removal or placement of the child continue to exist; and (3) termination of parental rights would best serve the needs and welfare of the child." *In re Adoption of M.E.P.*, 825 A.2d 1266, 1275-76 (Pa.Super. 2003). "Section 2511(a)(8) sets a 12–month time frame for a parent to remedy the conditions that led to the children's removal by the court." *In re A.R.*, 837 A.2d 560, 564 (Pa.Super. 2003). Once the 12–month period has been established, the court must next determine whether the conditions that led to the child's removal continue to exist, despite the

reasonable good faith efforts of the Agency supplied over a realistic time period. *Id.* Termination under Section 2511(a)(8) does not require the court to evaluate a parent's current willingness or ability to remedy the conditions that initially caused placement or the availability or efficacy of Agency services. *In re Adoption of T.B.B.*, 835 A.2d 387, 396 (Pa.Super. 2003); *In re Adoption of M.E.P., supra*.

Under Section 2511(b), the court must consider whether termination will meet the child's needs and welfare. *In re C.P.*, 901 A.2d 516, 520 (Pa.Super. 2006). "Intangibles such as love, comfort, security, and stability are involved when inquiring about the needs and welfare of the child. The court must also discern the nature and status of the parent-child bond, paying close attention to the effect on the child of permanently severing the bond." *Id.* Significantly:

> In this context, the court must take into account whether a bond exists between child and parent, and whether termination would destroy an existing, necessary and beneficial relationship.
>
> When conducting a bonding analysis, the court is not required to use expert testimony. Social workers and caseworkers can offer evaluations as well. Additionally, Section 2511(b) does not require a formal bonding evaluation.

*In re Z.P., supra* at 1121 (internal citations omitted).

"The statute permitting the termination of parental rights outlines certain irreducible minimum requirements of care that parents must provide for their children, and a parent who cannot or will not meet the requirements

within a reasonable time following intervention by the state, may properly be considered unfit and have…her rights terminated." ***In re B.L.L.***, 787 A.2d 1007, 1013 (Pa.Super. 2001). This Court has said:

> There is no simple or easy definition of parental duties. Parental duty is best understood in relation to the needs of a child. A child needs love, protection, guidance, and support. These needs, physical and emotional, cannot be met by a merely passive interest in the development of the child. Thus, this [C]ourt has held that the parental obligation is a positive duty which requires affirmative performance.
>
> This affirmative duty encompasses more than a financial obligation; it requires continuing interest in the child and a genuine effort to maintain communication and association with the child.
>
> Because a child needs more than a benefactor, parental duty requires that a parent exert [herself] to take and maintain a place of importance in the child's life.
>
> Parental duty requires that the parent act affirmatively with good faith interest and effort, and not yield to every problem, in order to maintain the parent-child relationship to the best of…her ability, even in difficult circumstances. A parent must utilize all available resources to preserve the parental relationship, and must exercise reasonable firmness in resisting obstacles placed in the path of maintaining the parent-child relationship. Parental rights are not preserved by waiting for a more suitable or convenient time to perform one's parental responsibilities while others provide the child with [the child's] physical and emotional needs.

***In re B.,N.M., supra*** at 855 (internal citations omitted). "[A] parent's basic constitutional right to the custody and rearing of…her child is converted, upon the failure to fulfill…her parental duties, to the child's right to have proper parenting and fulfillment of [the child's] potential in a permanent,

- 15 -

healthy, safe environment." ***Id.*** at 856.

After a thorough review of the record, the briefs of the parties, the applicable law, and the opinion of the Honorable Lyris F. Younge, we conclude Mother's issues merit no relief. The Juvenile Court opinion comprehensively discusses and properly disposes of the questions presented. (***See*** Juvenile Court Opinion, filed February 10, 2017, at 5-8) (finding: DHS removed Children from Mother's care because Mother was homeless and unable to feed Children or perform parental functions; Mother's Single Case Plan objectives required her to complete parenting classes, find appropriate housing, comply with dual diagnosis services, obtain and maintain employment, attend supervised visitation with Children, and attend court-ordered parenting capacity evaluation ("PCE"); DHS referred Mother to Dr. Williams for PCE to determine Mother's capacity to provide safety and permanency for Children; Dr. Williams testified that she had concerns about Mother's ability to accept responsibility for Children's removal from Mother's care; Dr. Williams further testified Mother did not understand how her behavior affected Children; at time of July 2015 PCE, Mother had been unemployed for substantial period and lacked appropriate housing; at July 2016 termination hearing, Mother still had not obtained appropriate housing for Children; Mother failed to attend and/or schedule recommended anger management classes; Family School suspended Mother for accessing Facebook and displaying sexual pictures during class; DHS

social worker testified that Mother lacked ability to perform parental duties, provide Children with safety and care, or adequately address S.R.S.'s developmental and behavioral needs; DHS social worker further testified that Mother could not maintain consistent housing or establish realistic housing budget; Mother resided with various paramours who refused to submit to appropriate DHS clearances; Mother conceded she lacked appropriate housing for Children and prioritized relationships with paramours over Children's needs; Mother failed to achieve unsupervised visitation with Children; S.R.S. has not lived with Mother since S.R.S.'s adjudication in August 2013, and S.N.G. has not ever lived with Mother; Children share parental bond with foster parent; foster parent satisfies Children's daily needs; social worker testified Children would not suffer irreparable harm if court terminated Mother's parental rights to Children; S.R.S. and Mother share bond; Mother's bond with S.R.S., however, is not parental bond; Mother is merely visitation resource for Children, not permanency resource; testimony of DHS witnesses supported change of permanency goal from reunification to adoption; termination of Mother's parental rights is in Children's best interests and proper under Sections 2511(a)(1), (a)(2), (a)(5), (a)(8), and (b)).  Accordingly, we affirm on the basis of the Juvenile Court's opinion.

Orders and decrees affirmed.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary


Date: 6/20/2017

THE COURT OF COMMON PLEAS OF PHILADELPHIA COUNTY

FIRST JUDICIAL DISTRICT OF PENNSYLVANIA

FAMILY COURT DIVISION               PROPROTHY

| | | |
|---|---|---|
| IN RE: S.R.S. | : | CP-51-DP-0001672-2013 |
| | : | CP-51-AP-0000018-2016 |
| IN RE: S.N.G. | : | CP-51-DP-0001511-2014 |
| | : | CP-51-AP-0000017-2016 |
| | : | |
| APPEAL OF: C.A.S., Mother | : | Superior Court |
| | : | No. 2786 EDA 2016 |
| | : | No. 2793 EDA 2016 |

OPINION

**Younge, J.**

This appeal arises from this Court's Order on July 25, 2016, terminating the parental rights of C.A.S. ("mother"), pursuant to the petitions filed on behalf of the Department of Human Services ("DHS") by the City of Philadelphia Solicitor's Office. Emily Beth Chernick, attorney for Mother, filed a timely appeal from the July 25, 2016 order terminating Mother's parental rights including an attached Concise Statement of Errors, Affidavit of Service, and other related documents necessary to perfect this Appeal.

**Factual and Procedural Background:**

A summary of the relevant procedural history is set forth as follows:

In March of 2013, S.R.S. and her mother, C.A.S. were evicted from the Salvation Army Shelter at 715 North Broad Street, Philadelphia, PA. During her time at the shelter, C.A.S. appeared to be suffering from auditory impairment and relying on reading individuals' lips when speaking with them. As a result, C.A.S. was a risk while walking among traffic in the street as she was unable to hear.

Subsequently, S.R.S. and her Mother began residing with the children's maternal Grandmother, another relative and friends.

On August 6, 2013 the Department of Human Service (DHS) received a General Services Report which stated that Mother and S.R.S. lacked appropriate and stable housing. The report indicated Mother and an unnamed paramour took S.R.S. to Whole Foods Supermarket in Philadelphia to solicit people for money and food. It was reported Mother and S.R.S. appeared unkept, that S.R.S. was wearing shoes that were too small for her feet. S.R.S. exhibited she was limited in her ability to speak. The report indicated Mother had been evicted from the Salvation Army Shelter due to a physical altercation. S.R.S's father was at work at the time of the report.

Subsequently, DHS learned that Mother had taken S.R.S. on previous occasions to Whole Foods Supermarket and had been observed soliciting people for money and food.

On August 6, 2013, Father stated to DHS that he would pick up S.R.S. on the morning of August 7, 2013. On August 7, 2013, DHS telephoned Father and left two voicemail messages regarding S.R.S. Father did not return DHS' telephone calls and did not pick up S.R.S.

On August 7, 2013, DHS obtained an Order of Protective Custody (OPC) for S.R.S. and she was placed in a Lutheran Children and Family Services foster home. Mother lacked appropriate and stable housing.

Mother had previously been offered opportunities to have a mental health evaluation and auditory evaluation and refused to accept referrals and services to evaluate her condition.

At the Shelter Care Hearing held on August 9, 2013, for S.R.S., the Court lifted the OPC and ordered the temporary commitment to DHS to stand.

At the Adjudication Hearing held on August 26, 2013 for S.R.S. the Court discharged the temporary commitment, adjudicated S.R.S. dependent, committed her to DHS, ordered S.R.S. to have medical examination, and ordered a paternity test for Father.

On November 22, 2013, an Individual Service Plan (ISP) meeting was held for S.R.S. The objectives for Mother were to complete parenting classes; to attain appropriate housing; to follow the Clinical Evaluation Unit (CEU) recommendations; and to obtain appropriate employment.

On February 7, 2014, an ISP meeting was held for S.R.S. The objectives for Mother were to complete parenting classes; to attain appropriate housing; to follow CEU recommendations ; and to obtain appropriate employment.

On April 1, 2014, it was reported that there had been minimal compliance with the permanency plan by Mother and alleged Father. It was reported that the paternity test confirmed that Father's paternity. The Court referred Mother to the Achieving Reunification Center (ARC) program; referred Mother to the Behavioral Health System (BHS) for consultation and /or evaluation; ordered Mother and Father to comply with ARC services; and ordered DHS to refer Mother for parenting capacity evaluation.

On June 15, 2014, DHS learned that Mother had given birth to S.N.G. at Pennsylvania Hospital on June 13, 2014, that S.N.G. was ready to be discharged, and that Mother lacked housing and resided in a women's shelter.

On June 16, 2014, DHS visited S.N.G., Mother and S.N.G.'s Father at the hospital. DHS learned that S.N.G. was not ready for discharge because she needed to undergo treatment for syphilis. DHS also learned that Mother was not able to care for S.N.G. because she was homeless. Father was residing in a boarding room where children were not permitted.

Mother identified a relative as a possible caregiver for S.N.G. and DHS determined the relative to be an appropriate caregiver.

On June 25, 2014, DHS obtained an Order of Protective (OPC) for S.N.G. and she was placed in the care of a relative. Mother was discharged from the ARC parenting program for non-compliance. Mother suffered from depression and was receiving treatment at the Community Council Health System.

2

An ISP meeting was held for S.N.G. on June 25, 2014. The objectives for Mother were: to maintain her housing with all operable conditions for her child; to seek employment to maintain household bills; to complete mental health; to complete Family School; to be consistent with visitation. The objectives for Father obtain housing with all operable conditions for the child; to seek employment and maintain household bills; to take frequent urine screens at CEU; to enroll in/attend a drug and alcohol program daily; and to be consistent with visitation.

At the Shelter Care Hearing held on June 27, 2014 for S.N.G., the Court lifted the OPC, and ordered the temporary commitment to DHS stand. The Court referred Mother and Father to CEU for a drug screen, an assessment, and monitoring. The Court ordered that Mother not engage in any illicit substance; ordered that if Mother failed to comply, the Court would hold her in contempt; and ordered Mother and Father to come to CEU on June 30, 2014.

On July 15, 2014, it was reported that there had been minimal compliance with the permanency plan by Mother. It was reported that Father was incarcerated. The Court ordered Mother to comply with all Family Service Plan (FSP) objectives, ordered Mother to request additional services at Community Council, and ordered Mother to attend the parenting capacity evaluation scheduled on July 16, 2014.

At the Adjudication Hearing held on August 4, 2014 for S.N.G., the Court discharged the temporary commitment and adjudicated S.N.G. dependent committing her to DHS. It was reported that Mother and Father lacked suitable housing. Mother was receiving mental health treatment through Community Council, and had re-engaged with parenting classes through ARC. Mother had been referred to Family School.

On September 18, 2014, a revised FSP meeting was held. The FSP goal was to return to parent, guardian, or custodian. The FSP parental objectives were to learn and understand age appropriate behavior and expectations for children; to set age appropriate expectations for the children; to meet with Family School to learn expected behavior for the children; to maintain the relationship between parent and the children through participation in placement activities and through regular visitation; to meet regularly with the agency social worker and adhere to ISP objectives; to provide adequate and safe living conditions; to locate and occupy suitable housing for the family with suitable space, heat and all other operable utilities; and to attend and complete Family School. There were additional objectives for Mother to meet the children's daily basic needs including food and clothing; to complete parenting education to address the expectations of providing care and meeting the physical needs of the children; to learn to budget her money and manage her household to assure stability for herself and both children; to learn how to provide and cook nutritious meals, dressing S.R.S. appropriately for the season, and keeping her clean at all times; to keep all visits and maintain regular contact with S.R.S.; to obtain and complete job training and /or seek and maintain employment; to participate in job counseling and referrals through ARC; to follow all recommendations and referrals furnished by ARC and complete all recommended services; to correct or stabilize physical health, vision, hearing, or dental problems; to sign authorization forms to allow CYD to obtain medical records and reports and progress of the children; and to comply with all recommended treatment or recommendations in regards to the children's overall medical health. Mother did not attend the meeting. Father did not attend the meeting.

On November 24, 2014, it was reported that there had been minimal a compliance with the permanency plan for the Fathers of the children.

3

On February 2, 2015, a revised FSP meeting was held, The FSP goal remained to return to parent, guardian or custodian. The FSP parental objectives were to obtain and complete job training and /or seek and maintain employment; to enroll in and regularly attend a job training or school education program ; to maintain the relationship between parent and the children through participation in placement actives and through regular visitation; to learn and understand age appropriate behavior and expectations for the children; to set age appropriate expectations of the children; to meet with the Family School; to learn expected behavior for the children; to follow through and adhere to all recommendations as provided by Family School; to provide adequate and safe living conditions; to locate and occupy suitable housing for the family with suitable space, heat and all other operable utilities; to correct or stabilize physical health, vision, hearing, or dental problems to ensure that the children receive appropriate routine medical/dental evaluations; to comply with all recommended treatments; and to sign authorizations forms to allow CYD to obtain medical records and reports. There were additional objectives for Mother to enroll in and regularly attend a job training or school education program; to keep all visits and maintain regular contact with the children; to meet regularly with the agency workers and adhere to ISP objectives; to follow through with all housing requirements to ensure timely progress of the housing referral /packet; to address deficits around matters of age appropriate development tasks and skills; and to ensure S.R.S.'s participation in special services to overcome development delays. Mother attended the meeting and signed the FSP.

On February 7, 2015, an ISP was held for S.R.S. The objectives for Mother were to complete parenting class; to attain appropriate housing; to follow CEU recommendations; and to obtain appropriate employment.

On May 27, 2015, a revised FSP meeting was held.
The goal for children remained to remain to return, to parent, guardian, or custodian. then FSP parental objectives were to maintain the relationship between parent and the children through participation in placement activities and through regular visits; to learn and understand age appropriate behavior and expectations for the children; to set age appropriate expectations for the children; to meet with Family School; to learn expected behavior for the children; to follow through and adhere to all recommendations as provided by Family School; to provide adequate and safe living conditions; to locate and occupy suitable housing of the family with suitable space, heat, and all other operable utilities; to correct or stabilize physical health, vision, hearing, or dental problems; to make themselves available for all medical consents as recommended by the health care provider; and to sign an authorization form to allow CYD to obtain medical records and reports. There were additional objectives for Mother to obtain and complete job training and/or seek and maintain employment; to enroll in an regular attend a job training or school education program; to keep all visits and maintain regular contact with children; to meet regularly with the agency workers and adhere to ISP objectives; and to follow through with all housing requirements to ensure timely progress of the housing referral /packet. Mother attended the meting and signed the FSP.

On June 8, 2015, the Court ordered Mother to attend and complete the second portion of the Parenting Capacity Evaluation and referred Mother to BHS for monitoring.

On July 30, 2015, a Single Case Plan (SCP) was created. The objectives for Mother were to comply with the types of visit agreed on by the Court; to find stable housing for her family; to find stable employment in order to provide financial security for her family; to comply with mental health

4

treatment and any recommendations following treatment; to comply with the parent capacity and its recommendations; and to comply with the goals set by Family School and their recommendations.

On September 8, 2015, it was reported that there had been minimal compliance with the permanency plan by Mother.

The matter was the listed on a regular basis before judges of the Philadelphia Court of Common Pleas-Family Court Division- Juvenile Branch pursuant to section 6351 of the Juvenile Act, 42 Pa. C.S.A. § 6351, and evaluated for the purpose of determining and reviewing the permanency plan of the child.

In subsequent hearings, the Dependency Review Orders reflect the Court's review and disposition as a result of evidence presented, primarily with the goal of finalizing the permanency plan.

On July 25, 2016, during the Termination of Parental Rights Hearing for Mother, the Court found by clear and convincing evidence that mother's parental rights as to S.R.S. and S.N.G., should be terminated pursuant to the Juvenile Act. Furthermore, the Court held it was in the best interest of the children that the goal be changed to Adoption.

## Discussion

The grounds for involuntary termination of parental rights are enumerated in the Adoption Act at 23 Pa. C.S. § 2511. Under this statute, the trial court must engage in a bifurcated process in which it initially focuses on the conduct of the parent under § 2511(a). _In the Interest of B.C._, 36 A.3d 601 (Pa. Super 2012). If the trial court determines that the parent's conduct warrants termination under § 2511(a), it must then engage in an analysis of the best interest of the child under § 2511(b). _Id._

In the present case, Mother's parental rights were terminated based on §§2511(a), (1), (2), (5), (8) and §2511(b).

In proceedings to involuntarily terminate parental rights the burden of proof is on the party seeking termination to establish by clear and convincing evidence the existence of grounds for termination. _In re Adoption of Atencio,_ 650 A.2d 1064 (Pa. 1994). The standard of clear and convincing evidence is defined as testimony that is so "clear, direct, weighty and convincing as to enable the trier of fact to come to a clear conviction without hesitation of the truth of the precise facts in issue." _In re J.D.W.M._, 810 A2d 688, 690 (Pa.Super. 2002).

To satisfy §2511(a)(1), the moving party must produce clear and convincing evidence of conduct sustained for at least six (6) months prior to filing of the termination petition, which reveal a settled intent to relinquish parental claim to a child or a refusal or failure to perform parental duties. It is clear from the record that for a period of six (6) months leading up to the filing of the Petition for Involuntary Termination, Mother failed to perform parental duties for the children. The Court found by clear and convincing evidence that the Mother failed to perform her parental duties.

Mother was referred by DHS to Dr. Williams for a Parenting Capacity Evaluation to determine Mother's capacity to provide safety and permanency. (N.T. 7/25/16, pgs. 34-35) The evaluation was ordered by the Court in July 2014, performed on July 16, 2015 and completed in September

5

of 2015. (N.T. 7/25/16, pg. 37, 48) Dr. Williams testified about concerns of Mother's ability to accept responsibility for the removal of S.R.S. and S.N.G. from her custody and care. (N.T. 7/25/16, pg 38) Furthermore, Dr. Williams testified Mother lacked understanding of the effects of her behavior on her children. (N.T. 7/25/16, pg. 40) Dr. Williams testified Mother had a pattern of longevity of a lack of employment and no direct reason for the unemployment. (N.T. 7/25/16, pgs. 38, 50) Mother reported she had one week of a seasonal employment in her life at the age of 21 (N.T. 7/25/16, pg. 47) Mother failed to have appropriate housing at the time of the evaluation. (N.T. 7/25/16, pg. 42)

At the time of the hearing, Mother failed to obtain appropriate housing, to complete, attend or schedule any anger management treatment as directed by DHS and Parenting Capacity Evaluation recommendation. (N.T. 7/25/16, pgs. 49,50-51, 84-85, 87-88)

A parent has an affirmative duty to act in her children's best interest. "Parental duty requires that the parent not yield to every problem, but must act affirmatively, with good faith interest and effort, to maintain the parent-child relationship to the best of his or her ability, even in difficult circumstances." *In re Dale A., II*, 683 A.2d 297, 302 (Pa. Super. 1996). In reference to the parental contact, "to be legally significant, the contact must be steady and consistent over a period of time, contribute to the psychological health of the child, and must demonstrate a serious intent on the part of the parent to recultivate a parent-child relationship, and must demonstrate and willingness and capacity to undertake the parenting role". *In re D.J.S.*, 737 A2d 283, 286 (Pa.Super. 1999) (quoting *In re Adoption of Hamilton*, 549 A.2d 1291, 1295 (Pa.Super. 1988)).

Testimony of the social worker stated Mother had a Single Case Plan objectives to foster reunification with her children. (N.T. 7/25/16, pg. 54, 84) The Single Case plan required mother to complete parenting, find appropriate housing, comply with dual diagnosis assessments and services, obtain and maintain employment, visit and comply with recommendation of parenting capacity evaluation. (N.T. 7/25/16, pg. 54) Mother failed to engage in anger management classes. (N.T. 7/25/16, pg. 87-88) The social worker testified Mother lacked ability to parent and provide safety and care for her children as of date of the hearing. (N.T. 7/25/16, pg. 78) Furthermore, testimony of the social worker stated Mother could not appropriately address S.R.S.'s developmental and behavioral needs. (N.T. 7/25/16, pgs. 77, 81)

The social worker testified Mother was inconsistent with her housing. (N.T. 7/25/16, pg. 80) Mother during the life of the case, continued to reside with various paramours who refused to submit to appropriate DHS clearances. (N.T. 7/25/16, pgs. 72-73) The social worker testified Mother did not have appropriate housing as of the day of the hearing. (N.T. 7/25/16, pgs. 73-74) Mother was not realistic in her budget or resources for housing. (N.T. 7/25/16, pg. 74) Mother, in her admission, testified she did not currently have appropriate housing. (N.T. 7/25/16, pgs. 114-115) Mother testified she refused an offer of shelter housing as means of reunification with S.R.S. and S.N.G. (N.T. 7/25/16, pgs. 73, 114-115). Mother admitted in her testimony she was removed from several shelters for failing to adhere to the rules and for engaging in physical altercations. (N.T. 7/25/16, pg. 116)

Mother testified and admitted she was suspended from Family School due to sexual pictures and sexual activity while she was attending the Family School. (N.T. 7/25/16, pgs. 51, 119) Mother during her testimony admitted S.R.S. and S.N.G. were removed from her custody and care in 2013 and 2014 due to lack of appropriate housing and lack of food. (N.T. 7/25/16, pg. 114)

In the present matter, S.R.S. and S.N.G. had been in DHS care for thirty-five (35) months. (N.T. 7/25/16, pg. 15) S.R.S had not lived with Mother since August 2013. (N.T. 7/25/16, pg. 82) The supervised visits Mother attended with S.R.S. and S.N.G. over a span of three years were not expanded to include unsupervised visits. (N.T. 7/25/16, pgs. 46, 86, 134) Dr. Williams in her Parental Capacity Evaluation stated Mother's visits should remain supervised. (N.T. 7/25/16, pg. 48) Testimony of the social worker was there were concerns about Mother's visitation schedule failure to change from supervised to unsupervised due to concerns of Mother exposing S.R.S. and S.N.G. to inappropriate individuals and unstable relationships. (N.T. 7/25/16, pgs. 87, 99-100) Social worker's testimony was Mother had inappropriate conversations with S.N.G. during a visit (N.T. 7/25/16, pgs. 97-98) Mother admitted in her testimony she prioritized relationships with people over prioritizing the children's needs. (N.T. 7/25/16, pgs. 107, 123)

Section 2511 (a)(2) requires that "repeated and continued incapacity, abuse neglect or refusal of the parent has caused the child to be without essential parental care, control or subsistence necessary for her physical or mental well-being and the condition and causes of the incapacity, abuse, neglect, or refusal, cannot or will not be remedied by the parent. 23 Pa. C.S. § 2511 (a)(2).

Termination of parental rights under §2511 (a)(2) is not limited to affirmative misconduct but may include acts of refusal, as well as incapacity to perform parental duties. *In re A.L.D.*, 797 A.2d 326, 337 (Pa.Super. 2002).

§2511 (a)(5) requires that :

>   (5)     The child has been removed from the care of the parent by the court or under a voluntary agreement with an agency for a period of at least six months, the conditions which led to the removal or placement of the child continue to exist, the parent cannot or will not remedy those conditions within a reasonable time, the services or assistance reasonably available to the parent are not likely to remedy the conditions which led to the removal or placement of the child within a reasonable period of time and termination of parental rights would best serve the needs and welfare of the child.

§2511 (a)(8) states:

>   (8)     The child has been removed from the care of the parent by the court or under a voluntary agreement with an agency, twelve (12) months or more has elapsed from the date of the removal or placement, the conditions which led to the removal or placement of the child continue to exist and termination of the parental rights would serve the best needs and welfare of the child.

The evidence as discussed above pursuant to §2511 (a)(5) and (a)(8), equally support the Court's conclusion to terminate mother's parental rights.

In order to terminate the parental rights, the party seeking termination must prove by clear and convincing evidence that the termination is in the best interest of the child. 23 Pa. C.S. §2511 (b); *In re Bowman*, 647 A.2d 217 (Pa. Super. 1994). The best interest of the child is determined after consideration of the needs and welfare of the child. The trial court must examine the individual circumstances of each case and consider all explanations offered by the parent facing termination of this parental rights to determine if the evidence, in the light of the totality of the circumstances, clearly warrant involuntary termination.

7

When determining the best interest of the child, many factors are to be analyzed, "such as love, comfort, security, security and stability. *In re Adoption of T.B.B.*, 835 A.2d 387, 397 (Pa. Super. 2003). Another factor that a court is to consider is what, if any, bond exist for the child. *In re Involuntary Termination of C.W.S.M and K.A.L.M.*, 839 A.2d 410, 415 (Pa. Super 2003).

Pursuant to Section 2511(b), the trial court must take account whether a natural parental bond exists between child and parent, and whether termination would destroy an existing, necessary and beneficial relationship. *In re C.S.*, 761 A.2d 1197(Pa. Super. 2000).

In the present matter, during the thirty five months (35) the children have been in DHS care, S.R.S. and S.N.G. have a parent-child bond relationship with their Paternal Aunt, their foster parent. (N.T. 7/25/16, pgs. 136-137) Mother testified S.R.S. and S.N.G.'s clothing and daily needs were being met by the foster parent, Paternal Aunt. (N.T. 7/25/16, pgs. 118-119) Furthermore, Mother testified if her rights were terminated she would want her children to remain with the foster parent Paternal Aunt. (N.T. 7/25/16, pg. 118-119) The social worker testified S.R.S. and S.N.G. would not suffer any detrimental impact, nor irreparable harm, if their Mother's parental rights were terminated. (N.T. 7/25/16, pgs. 80, 83)

The Court found convincing the testimony that S.R.S. had a bond with her Mother, however cautioned there was a lack of parental bond. (N.T. 7/25/16, pg. 135) The Court found credible social worker's testimony Mother was a visitation resource, not a permanency resource. (N.T. 7/25/16, pg. 136) The Court indicated S.R.S. and S.N.G.'s day to day parenting needs were being provided in their current placement with the Parental Aunt, foster parent. (N.T. 7/25/16, pgs. 134-135) The Trial Court found by clear and convincing evidence that the Department of Human Services met their statutory burden pursuant to 23 Pa. C.S.A. § 2511 (a) (2),(5), (8) & (b) and that it was in the best interest of the children to change their goal to adoption (N.T. 7/25/16, pgs. 136-137)

## Conclusion:

For the foregoing reasons, the Court finds that the Department of Human Services met its statutory burden by clear and convincing evidence regarding the termination of parental rights pursuant to 23 Pa. C.S. §2511 (a),(1), (2), (5) and (8) and §2511(b). Furthermore, the Court finds that its ruling will not cause S.N.S. and S.R.S. to suffer irreparable harm and it is in the best interest of the children based on the testimony regarding the children's safety, protection, mental, physical and moral welfare, to terminate Mother's parental rights.

Accordingly, the Trial Court's Order entered on July 25, 2016, terminating the parental rights of mother, C.A.S.          , should be properly affirmed.

By the Court

J.

8